With that, this thing is really, I don't think I'm talking that loud. Anyway, okay, fair enough. We'll call case number 16-40475, United States v. Garcia, and we will first hear from Mr. Perez. May it please the court for the counsel. Appellant's brief relies on the holding of the Michigan court in U.S. v. Santiago Hernandez, and that's cited in the brief. We also rely on this court's decision in U.S. v. Orellana. In that case, you did not deal with a special immigration juvenile, but you dealt with a temporary protected status immigrant or alien. I submit that the same reasoning that the court used in that case applies to Mr. Garcia, appellant hearing, who had the status of special immigration juvenile. As in Santiago Hernandez and the Michigan court. Well, a lot of the circumstances are similar to that, but a big difference is this immigration, this status is given to juveniles who both federal law and most state laws impose restrictions on possession of firearms. So should we take account of the fact that it's generally not favored for juveniles to have firearms and deciding whether this status allows your client to? I do not disagree with that statement. However, my client was not a juvenile when he possessed the gun. He was still under that status in this country, but he was not a juvenile. But the bigger question is whether people with that status are allowed to possess firearms. So don't we have to look at the fact that it's a status given only when you're under the age of 21? The status that was given to him allowed him to remain in the country so that he could try to adjust his status. And he was here lawfully under that special immigration juvenile status. Well, I want to ask about that because I have the same question Judge Costa does when we're talking about just your client and just this status. I think you have to look holistically, and I think that's a problem for you. But I wanted to look at this more broadly because we know that there are, and the number varies, several million people living in this country who do not have what we'll call full status. And not all of those people are prosecuted. And some of those people are removed in abstention in 1992, and then they show up in my court in 2015. They're still here. So we know that there are a lot, at least some people, without full status who nonetheless are not deported or removed. And who are not prosecuted in any way. And sometimes by design, the government will decide, look, we're going to prefer for removal people who have prior criminal backgrounds versus people who don't, and so on. Because it's such a massive number of people, they can't do everyone. Where do we cross the line from I'm not deporting you today to you're here lawfully? I mean, the failure to remove someone from the country to me does not mean they're here lawfully. So tell me where that line is. At any time. At any time that the government, the Homeland Security Secretary decides, or somebody acting under their authority decides to remove that person. He doesn't have any immigration status. However, he does have some status because he's paroled into the country. And you're at the discretion of immigration. They can decide to remove you at any time. I hope that answers that question. But can we call that lawful? The fact that someone in the U.S. with power to do so exercises a discretion not to remove someone. To me, can we say that's lawful? Because that would cover a lot of people that most people would consider unlawfully here. It does, and I would say it is lawful. There was another case that was cited by the government in its brief, the Tula-Rubio case, in which I believe that you participated, Judge Haynes, in a dissent. When a motion for a rehearing in bank was denied, there was a dissent in which I believe you participated. In that dissent, the dissent cites a case out of the Ninth Circuit, Garcia v. Holder. That case also specifically deals with special immigration juvenile and concluded that they do have a status. In that dissent, the court, the dissent concludes that a special immigration juvenile has a status and that it's different than other type of people being here that are paroled in this country. It's not just that there's a discretionary decision not to deport your client. It's that this status eliminates one of the bars on being eligible for obtaining lawful permanent status, right? Or not being eligible. Right. I mean, it removes the, it considers him paroled so he doesn't have the obstacle that he wasn't paroled into the United States. And that's only because that's the way the law is written. It doesn't have anything to do with immigration necessarily. When Congress decided to defer to the ATF to implement this law, they didn't have to add the word parole there. They could have just said or defined it, you know, more specifically. Okay, but the hoop that Judge Costa references is a hoop in a series of hoops. And so your client still has not yet jumped through the final one, which is getting the status he's just allowed to apply for it. Which I agree, in this realm of immigration people sort of standing in line, you'd rather be that guy than the guy who has no hope. However, that's still not, in my view, the equivalent of lawful status. I mean, that's the question we have to deal with. And I guess this might be a good time for you to address the case that we asked y'all, you know, Friday. Nothing like getting a letter from the court on Friday afternoon. But we decided you'd rather have read the case than not before we started asking you about it. The Abramski case, which on the one hand, it says we don't really give deference to an agency's interpretation of a statute for criminal purposes. On the other hand, it says the rule of lenity is kind of a last resort, and you really have to consider the statute holistically. So tell me your views on that. My views are exactly as what this court stated in that dissent in Tula Rubio. I mean, it's a little worrisome when you're relying on a dissent from the denial of rehearing en banc as your authority for something. You know that. Well, I'm actually also relying on the majority opinion of Oriana, except that in that case, it was temporary protected status. But I'm saying that temporary protected status can also be granted to a juvenile that is not allowed to have a gun at the time that it is granted or buy one. And this has nothing to do with purchasing a gun. That's another problem that this statute has. It does not distinguish between ownership and possession. If I own a gun, I own it wherever it may be. But if I possess a gun only and do not own it, I only possess it when I have it. And there's no distinguishment in the statute between possessing and ownership. The statute that was dealt upon in Nebraska was with the right to purchase a gun for somebody who could legally possess it. It also involved possession, but it also involves somebody that could legally buy it or legally possess it. I don't agree with the majority opinion. I agree with the dissent. Justice Scalia says. And if we were Congress, this would be helpful in terms of like, what's the policy arguments? But we're bound by majority opinions of the Supreme Court, majority opinions of our court, not beautifully written dissents, whether or not we joined in them or agree with them or think well of the people who wrote them. So focusing on majority opinions, Abramski's after Oriana. So does it alter Oriana? Well, let me focus on the majority opinion, which I disagree with because they state that the purpose of the law is to prohibit people that cannot purchase it or have it. Yet the question that was on that form 4773 did not deal with whether the person that was that it was being bought for could legally possess it or own it. And obviously, it was apparent that the person that it was being bought for, his father-in-law could legally possess the gun and own it and purchase it himself. But nevertheless, I don't believe that Abramski prohibits this court from ruling in defendants' favor. Abramski is not on point exactly with this. Doesn't it first help you in saying that the regulation isn't to be the deciding factor? Doesn't Abramski say that in a criminal statute, the government's interpretation of a criminal statute it's enforcing isn't to be given deference? Abramski deals with two issues that this court might consider and that has been considered in the cases that were cited by the defendant. One was deference. What deference should the court in deciding this issue on this statute give to the ATF? Interpretation of the regulation, okay? Well, the regulation itself is an interpretation of the statute, of the criminal law. Congress gets to make the criminal laws. And Abramski decided that you ignore whatever ATF has said and you basically take a very legal, judicious interpretation in construing or interpreting that statute. And you do so holistically, not just one little sentence. And exactly. There's no definition for the word parole anywhere or illegal alien. So when the court is acting strictly as a court and not taking whatever ATF might have said about it, it doesn't matter. In fact, this court said the same thing in Oriana, that we're not going to give deference to the ATF. Even without giving deference to the ATF, obviously we gave deference to the ATF, I would lose. Right? Well, you argued in your brief, you won under the regulation. But we don't give deference to the ATF because the statute itself and the law, the way it's written, says the word parole. And so that is the issue that this court has to decide. Whether legally, in interpreting that statute, the fact that my client was paroled as a juvenile but now he's an adult, could he possess the gun, not own it? He doesn't own the gun. There's no evidence whether he owned it or not. But just possessed guns and ammunition. But the actual statute is just speaking of illegal or unlawfully in the U.S. Right. Second. The statute that we're construing is whether he was illegally or unlawfully in the United States. That's the question. The regulation speaks to what that might mean. And you're saying we should ignore it. I think what the U.S. Supreme Court is saying is we're not bound to give it any deference. However, that's not to say you can't consider it as persuasive, just like you could consider a law review article as persuasive, even though you're not bound by it. That said... And there's three courts that have decided that people under status are here legally. Oriana here, the Michigan court, and the Ninth Circuit in Garcia v. Holder. They've already decided that when you are paroled into this country, you are given lawful. You're not here illegally. You're here lawfully. Because there's no technical definition for the word lawfully. In fact, this court in Oriana said we have to give them the regular meaning. I suppose that when the Supreme Court is confronted with this issue, it will decide the same way. As? As you did in Oriana, as this court did in Oriana. Okay. As the Michigan court did in... Standing by for whatever the Supreme Court does, of course, we have to do our best at this juncture with what we have. And then the other matter that Abramski dealt with that could affect this case here is the issue of lenity, which comes back to the same thing on interpretation of the ATF statute. No, I don't think it's of the ATF. I think it's of the statute. And see, this goes back to Judge Costa's original point. That same Section 922 that has G, that's what your client's concerned about, has B, which has all this stuff about restricting sales to juveniles. And while I agree, that's not the exact question here. We're not talking about whether he bought a gun as a juvenile. I understand that. It suggests that Congress, in passing this, would not mean to exempt someone from the some other status. Okay. So that's the point that I'm saying is a special juvenile something that allows them to apply for some kind of status doesn't seem to be what would have been in Congress's contemplation of exempting someone from the usual unlawfully present. I need to close up. Got 42 seconds. But I'll say this. On the second point, it's vague. And we should ask Congress to rewrite that law. If Justice Scalia could not understand it and dissented, why should my client, who's a young man, understand it? There was dissents all over. All the other cases have dissents. Nobody understands that law because sometimes you interpret it one way, sometimes another. The dissenting in Abramski decided to use the rule of lenity. The majority did not. But it didn't matter. My client possessed lawful status because he was granted special immigration juvenile status. Thank you. Okay. Thank you. Need to save time for rebuttal. And we'll now hear from Mr. Goldman. Shall I begin, Your Honors? May it please the Court. My name is Adam Goldman, and I represent the United States in this matter. Your Honors, we ask this Court to affirm the decision of the District Court, which properly ruled that the defendant in this case, an individual that only had an approved visa petition, was not here legally or unlawfully, just like his prior status when he initially came to this country by sneaking across the river. So therefore, we would ask this Court to affirm the finding of the Court that a visa petition, whether it be for a special immigrant juvenile or someone else, the mere approval of that petition does not grant somebody any sort of legal— He wasn't actually granted the status. He was granted the ability to apply for the status. That is correct, Your Honor. I believe there's some confusion about the term status. What happens is when somebody gets a visa petition, they're given a visa classification. They can then use that approved visa classification to basically get in the queue when it's not an immediate relative. And then once their priority number becomes current, they can then apply that visa petition being approved as one of the requisites. There are two other requisites. One is that the person cannot be admissible under 1182. They have to be admissible. And the last one is that they have to be admitted or paroled into the United States. And I believe that is sort of where the issue comes into this case, is that when they enacted 1255H, the statute at issue here, for people with the approved I-360 visa petition, based on being a special immigrant, to try to get into a lawful status, they stated that for purposes of 1255A, the person is deemed to be paroled. And we submit that reasoning, that language indicates that it's only so that person can overcome that last of the hurdles in 1255A so that when their number does become current, they can then later actually adjust their status and get the green card. And once they do that, then they're lawfully here. That is our position, yes. Once the green card is granted, that is, that was. But in Orianas, the defendant didn't have a green card either. It was a similar situation where the temporary protected status for being from one of these countries that was treating people inhumanely removed a bar on being eligible for adjustment of status. So how do you distinguish Orianas? I mean, according to your regulation, in Orianas, the defendant unlawfully entered without inspection and authorization and had not been paroled into the United States. So, I mean, Orianas, under the regulation, that defendant would have been guilty. We would disagree, Your Honor. And we believe you have to read Lucio in conjunction with Oriana. In Lucio, under the temporary protected status, which is a different section, that's INA section 244, when somebody applies, they get what's called temporary treatment benefits. And in Lucio, this court said that person is not in any sort of status such that they cannot possess a weapon. When the status is actually granted, that's when Oriana kicks in. Now, we believe this is much closer to Lucio because what happens is when the I-360 is granted, there's no background check. There's no fingerprints. There's no biometrics. There's no examination for good moral character. All they look for is to see if the factors under 8 U.S.C. 1101 A27G and 8 CFR 204.11 are met. The most important issue there is obviously the order from the juvenile. But looking at the regulation, which might not matter, the defendant in Oriana, as you're saying, didn't meet the regulation. Why? He did come in without inspection and authorization, and he'd not been paroled in. So how was he deemed to be unlawfully or deemed to be lawfully in the United States when under that definition he would have been subject to the statute? Because he actually, we would submit, Your Honor, that does actually constitute a type of admission because he is going through the background check process. The government, the DHS, is actually looking at everything to make sure he, in fact, qualifies for this temporary time that he's allowed to be in the United States under TPS. Has Oriana mentioned this background process? I would refer the Court to the background is actually done under the statute and the regulation, 8 CFR 244 and 1244, as well as the statute in that case, which is INA Section 244. And the main thing you look for when you do a background check for TPS is that the person does not have two misdemeanors or one felony. So I just want to be clear. These distinctions you're making between the scenario in Oriana and our scenario, you're saying we can verify that by way of CFRs. We don't have to go outside the record, if you will. It's within these statutes and regulations which show us this distinction. Yes, Your Honor. That's what you're explaining? Yes, Your Honor. It's a statute read in conjunction with the regulations. Okay. But in other words, we don't have to go outside the sort of four corners of the statute and regulation books on the virtual shelf to get to this point. We don't have to go dig into the ICE's policy book or something like that. That is correct, Your Honor. There's no need to go beyond regulations. Okay. That's what I was trying to get to because I think that would be inappropriate, but I think we can look to the statutory regulatory framework to understand where we are. And I think that when one looks at the TPS situation, there you have sort of a two-step process. You have the application for the TPS and you get an employment authorization while that's pending. And due to the number, that usually takes a long time to go through all the background checks. Fingerprints are done in conjunction with that. Biometrics are done. And while that is pending, the person gets what's called temporary treatment benefits. And in Lucio, the court, this court stated that the temporary treatment benefits is not any sort of status. In our case, what you have is the person merely has the I-360 visa petition approved and nothing else. When the priority number becomes current, then the background checks are done. Then they look to see if he's actually inadmissible, which he would be inadmissible in this case based on his criminal record. So they go through those other steps. And only if that were to be approved, i.e. when he got the status adjusted, just like in Oriana, when the status was granted, that is when the person becomes legal or lawful. So we believe those are the important distinctions between this and Oriana. Do you think Abramski alters the world a little bit at all since Oriana in any way? We think, Your Honor, that if anything, that Oriana would suggest that the reasoning dealt with by the Michigan court, if it's to be followed and to be applied, would make the reasoning by the Michigan court inapplicable. Because the Michigan court in Santiago-Hernandez, for lack of a better term, relied solely on that regulation and coming up with its reasoning. I'm confused about what you're talking about.  In Santiago-Hernandez, Your Honor— No, no. I was asking about Abramski and I didn't understand. My question was, there's some text in Oriana about the rule of lenity, and I'm asking whether the U.S. Supreme Court case of Abramski alters that in any way. We believe that Abramski read with Oriana, Your Honor, actually would make—if they're to be read as any sort of altering manner, those two cases read together would limit substantially any effect by 478.11. Regarding lenity, Your Honor, we submit that the rule of lenity in this case would still not apply. This defendant was specifically notified in his notice that his status was not changed. He got a very specific notice stating that whether or not you're legal or unlawful, your status has not changed. This approval does not grant you any status. And to somehow think that in his particular case, the rule of lenity would apply such that he might believe his status changed, might believe that he could, well, in this case, lawfully possess a firearm while committing a kidnapping, we submit just doesn't fly because we should remember that in this case, it was not just a mere individual possessing a firearm in and of itself. As the sentencing made clear, he was possessing the firearm in conjunction with a kidnapping for which he was also convicted. So we believe that the rule of lenity in this case, Your Honor, would not assist the defendant whatsoever. Regarding, Your Honor, the claim that Garcia and Orrick assist the defendant, we would submit the United States. Well, and I don't want to argue with you, but on Abramski, what struck me about it is it said the rule of lenity is only when we're guessing at what Congress intended. And we have to first look at the totality of the statutes. And I haven't seen you really embrace the analysis that we addressed with Mr. Perez about the whole of 922 and how it doesn't seem to be encouraging juveniles to have guns and so forth and how that all links together. Do you think we're off on a tangent there or on a rabbit trail by making that suggestion? No, Your Honor. But if looking at the statute holistically, that would also adversely affect the defendant because I believe that 922G5B would come into place. That's the second part of this statute. 922G5B states that anyone here that is a non-immigrant, i.e., they came to this country lawfully, they went through an inspection process, they got admitted as a tourist, as a student, as some sort of lawful status, that statute says that person cannot possess a weapon unless it's some sort of hunting license and they get a specific hunting license, they have a specific weapon for the hunting, so certain hunting exceptions. But that statute makes it very clear when looking at it holistically that an individual that comes here lawfully as a student, a tourist, what you call a specialty worker, an H1B worker, those individuals can't possess a firearm. It's very clear under the statute when looking at it holistically. And we believe that it would be sort of in contravention of the statute holistically to then say all those people that went through the inspection process, went through the admission process, are here as lawful students, lawful tourists, they can't possess a weapon, but this individual that crossed over the Rio Grande illegally and merely got a visa petition somehow is allowed to possess a weapon. And we think another good example would be your typical... Well, that's true in Oriana, again, too, the person came in illegally, you could have swam through the river then. Let me ask you, what's the government's position on whether someone with a U visa would be prohibited from possessing a firearm? The U visas are given for victims of crime, say a sex trafficking victim, someone who's brought into the United States unlawfully for purposes of sex trafficking, and the U visa says, but we're nonetheless going to give them a visa because they've been victimized by this crime. I think there has to be a showing of psychological or physical harm, and they can be helping the government prosecute the people who brought them in. Would that person be able to have a firearm for protection? If the adjustment of status based on the U visa or any sort of granting of status based on the U visa has not been granted, Your Honor, then we would submit no. But no, if they've been given the visa, but they have no other status, if they'd already been given the visa. Your Honor, we would submit that granting a visa means granting some sort of status, because what we're dealing with here is the petition for the visa. And what happens is the visa itself is not granted, there's no... But I thought he got the juvenile status, he just didn't get the more, the permanent status. His application remains pending for that, right? That's where we disagree, Your Honor, with the term status. We believe that there's... You don't think there is juvenile status? We would submit that there's a juvenile classification, Your Honor. The status is actual, such as temporary protective status, adjustment to lawful permanent resident status. But when someone just has a visa petition approved, they're not in any sort of status. And I think the best way to look at this is to look at the line of cases, Iguatayo, Hussain Diaz, and Elwari, all stating that somebody with a visa petition does not have any sort of legal or lawful status, and Elwari was for possession of a weapon. The reason this is important, Your Honor, if this court looks at the statutes regarding visa petitions, take for example 1154A1A1 that deals with a married couple. Just because that person is married, they don't have any legal status. So, for example, an axe murderer engages in a very normal, bona fide marriage with a U.S. citizen. That person does not have status just because the marriage is bona fide, and yet the statute refers to that person as having immediate relative status. And these statuses... Because they can apply to stay based on being married. Right, yeah. It's just the visa petition gives them the classification. And I think that is sort of where maybe the confusion comes in, is that the visa petition itself does not grant any sort of immigration status, whether it be for a family... But haven't opinions said that this does give some sort of status? I mean, he cites Judge Jones' dissent. I understand it's a dissent, but she's saying we should even be more restrictive in that case, and she's distinguishing and saying, well, there's these other types of status like juvenile status. That's where we would disagree, Your Honor. In that dissent, and also the case he cited Garcia, that's different... That's the Ninth Circuit, Garcia? Yeah, that's different for three reasons. One, Your Honor, in that case, it dealt with something called cancellation of removal, and the person had to show that they were a lawful permanent resident for five years and actually admitted in some status for at least seven. And that court said that when there's a delay between the visa petition being filed and the adjustment of status being granted, not for a priority reason, but because of, for lack of a better term, a government screw-up, because there was just a delay in that case for no reason, that those extra years count. But in that case, the LPR status was granted. More importantly, Your Honor, in matter of RESA and matter of VZ, the Board of Immigration Appeals rejected the Ninth Circuit's reasoning in Garcia. The reason that comes into place is the Board of Immigration Appeals stated that the reasoning in Garcia and another case called Garcia-Quintero would not be followed across the country. Later on, in a case called Gomez-Soria, and this was all mentioned in the briefing before the district court, in Gomez-Soria, this court followed the Board of Immigration Appeals reasoning in RESA and VZ. So it appears that this court in Gomez-Soria actually followed the BIA's line of cases and stating that they were going on their own way in opposite of the Ninth Circuit in Garcia and Garcia-Quintero. So that's why we would believe that Garcia, if anything, has definitely not been followed by this court. And it's also factually dissimilar because it's dealing with a special part of cancellation of removal. Can you tell me where in the record it has the notice to Mr. Garcia that he doesn't have status? It was mentioned in the briefing, but I don't think there was a record site. I do know it might have been filed under seal, Your Honor. I can check on that, but I do believe it was filed under seal, which is why it's not on the record. Well, we should have the sealed record. I will double-check as to where. We're allowed to see the sealed record. We passed the background check, so to speak. My understanding, Your Honor, is it was filed with the lower court, and it's not disputed what these are actually standard notices as to what was stated in those notices. Well, if you would please send us a 28-J with just the site to that, if you could. I will, Your Honor. I think the site you gave us was to your briefing in the district court, so that's why there was some confusion about that. If I'm mistaken on that, you can tell me that, too. It might have been, Your Honor, but we would note that these notices are, I don't want to say boilerplate, but they are in fact boilerplate notices. When a visa petition is granted for a special immigrant juvenile, they have a front and a back, and the language that we provide. I would just like to see it. I don't get them myself routinely, so I would like to see it. I personally couldn't find it in the record, but that doesn't mean it's not there, and so that's why I'm asking you for a site. I will get that in the 28-J letter, Your Honor. Is the government still relying on the ATF regulation in light of Abramski? Your Honor, we believe that Abramski would suggest that the regulation should not, just like Oriana, suggests that the regulation should not be given force. We, of course, do not want to say that our own regulations are not applicable, but Abramski does suggest that relying on the regulation combined with what was stated in Oriana, that the ATF basically should not be given deference in immigration matters, is what Oriana stated, and that when those are read together, they do suggest that there's a very limited effect, if any, for 478.11. We would submit that 478.11, Your Honors, whether or not it's used, only supports the government's case. 478.11 has a laundry list of definitions, as this Court is well aware, and in this one, it has a list of what is considered to be some sort of legal or lawful status, and when it deals with parole, it deals with actual parole, which is under 1182d5, and that is specifically what the statute states. We would note that when it deals with what is legal or lawful status, it uses the word including. We believe that's actually very beneficial to the government, because if this Court looks at the definitions in 478.11, there's also a definition for controlled substances, and that definition states, including then, but not limited to, provided by a list of drugs. Here when they went down to the lawful or legal, they just stated including, and then had parole and the admission statutes. So therefore, we would submit that if the regulation is followed, the regulations only assist the government, and that is where we believe also that the Michigan Court was mistaken. Also, Your Honor, in Flores and in Lucio, both of those courts, when they were talking about the definition of parole, both Flores and Lucio specifically stated that when looking at parole, they were looking at 1182d5 under the regulation and nothing else as far as parole. That is further supported by the case of Ortega Cervantes of the Ninth Circuit. Let me ask you this, because you're starting to run out of time. I have some concern about the overall, like what impact does this case have on other cases or other situations. What is your perception as to the DREAMers? People who are here as DREAMers, can they possess a weapon, or are they unlawfully here? They're unlawfully here, Your Honor. Actually, as I'm speaking to you, someone in New Orleans from my office is addressing that very issue before a separate panel. Oh, yay. So I don't want to speak for him. He's a very capable colleague of mine. But what's he saying? In another gun case? Yes, Your Honor. It's a case out of our Corpus Christi division. But he's saying... They have no status. They have no status. So they also are unlawfully for purposes of possessing a weapon. Correct, Your Honor. And there is sort of a greater concern in cases such as this. Your Honor, the I-360 visa petition looks at very specific matters regarding whether or not the person is a ward of the state, what the juvenile court determines. It only looks at those factors and nothing else. This could... So people that come across the border, that sneak across the border, by filing a 360, getting it approved for those factors alone, if this court were to state that they all have status by the mere filing and approval of that visa petition, by way of analysis, they would all be allowed to lawfully and legally possess a gun under 922 G5. We submit that was never the intent of Congress to state that everyone that files this one visa petition can now possess guns, irrespective of the rest of their immigration status, their criminal history, their background checks, which have not even been done. We just submit that that would not be in the congressional basis. Lastly, Your Honor, again, going back to Oriana, because I know that's a concern, I'll try to be quick. That dealt with the actual granting of status. In that case, a statutory status was in fact granted. A statutory temporary immigration status was granted under 244. Here no immigration status has been granted, because the apply for status under 1255, and that was never granted. Thank you very much, Your Honor. We ask that you affirm. Thank you. All right, Mr. Perez, your rebuttal. May it please the Court, just briefly, his last comment, that the difference between granted status and that SIJ is not necessarily granted status is answered by the two cases that I cited, Garcia v. Holder and the Michigan case, wherein those courts conclude that it does grant status. The Court asked whether that status still continued. That is answered in the memorandum of law that the trial judge signed on January 15th, and it's part of the record excerpts, where it's stated that his SIJ was still continuing. His application that he had filed for adjustment of status was pending. And I bet it still is. And just one more thing, there is a law review article written on Abramski that maybe the Court or its aides should consider reading. That's Ohio Northern University Law Review, Volume 41, and it dissects Abramski. Okay. Thank you very much. Very much appreciated.